**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| Andrea McKinley, | Civil Action No. 3:21-cv-241 |
| Plaintiff, | **NOTICE OF REMOVAL** |
| v. | |
| UBS Financial Services, Inc., | |
| Defendant. | |

EXHIBIT B

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

ANDREA MCKINLEY

      Plaintiff,

v.

UBS FINANCIAL SERVICES, INC.

      Defendant.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21-CVS-5376

2021 APR 23 P 2: 31

MECKLENBURG CO.. C.S.C.

BY

)
)
)
)
)
)
)
)
)
)
)

**COMPLAINT**

NOW COMES Plaintiff Andrea McKinley, by and through undersigned counsel, complaining against Defendant UBS Financial Services, Inc., alleging as follows:

## PARTIES AND JURISDICTION

1.      Plaintiff Andrea McKinley (hereinafter, "Plaintiff" or "Andrea") is an adult resident of Mecklenburg County, North Carolina.

2.      Defendant UBS Financial Services, Inc. (hereinafter, "Defendant" or "UBS") is a foreign corporation organized under the laws of Delaware with a principal place of business in Weehawken, New Jersey. UBS can be served through its registered agent, Corporation Service Company, 2626 Glenwood Ave., Suite 550, Raleigh, NC 27608.

3.      UBS is a wholly owned subsidiary of UBS Americas, Inc., which in turn is a wholly owned subsidiary of UBS Group AG, a multinational investment bank and financial services firm headquartered in Zurich, Switzerland. UBS and its affiliated companies provide financial services in over 50 countries.

4.      UBS is engaged in substantial activity within North Carolina, including without limitation at its "Wealth Advice Center" (WAC) at 11325 N. Community House Rd., Suite 600, Charlotte, NC 28277 (hereinafter, the " Charlotte Wealth Advice Center" or simply "Charlotte

WAC"). This Court has personal jurisdiction over Defendant, including but not limited to under N.C. GEN. STAT. § 1-75.4(1)(d).

5.    Andrea seeks damages in sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. GEN. STAT. § 7A-243.

6.    Venue is proper in Mecklenburg County pursuant to N.C. GEN. STAT. § 1-80.

7.    On May 4, 2020, Andrea timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), in Charge No. 430-2020-01819. The EEOC issued a right-to-sue letter on or after January 6, 2021.

8.    On April 5, 2021, Andrea timely filed an Application and Order for Extension of Time, thereby extending the deadline for her to file a complaint in this matter until April 26, 2021.

9.    This Complaint is timely filed pursuant to the Order for Extension of Time granted by the court.

## FACTUAL BACKGROUND

### Andrea's Early Employment and Promotions

10.    In May 2017, Andrea graduated with a bachelor's degree in finance and marketing from the University of North Carolina Charlotte (UNCC). She was hired by UBS in June 2017 to work as a "Training Financial Advisor" ("TFA") in the Charlotte WAC.

11.    UBS operates another Wealth Advice Center at the company's United States headquarters in Weehawken, New Jersey (the "Weehawken WAC").

12.    Both WACs provide essentially the same service, that is telephone financial advice and support for UBS's clients with assets under management, typically of $250,000 or

less. An inbound client service call can be routed either to the Charlotte WAC or the Weehawken WAC.

13.      In late summer 2017, Andrea trained, took and passed the Series 7 exam ("General Securities Representative Exam") and the Series 66 exam ("Uniformed Combined State Law Exam"), both of which are administered by the Financial Industry Regulatory Authority ("FINRA").

14.      UBS promoted Andrea to a full-fledged Financial Advisor in January 2018. In the fourth quarter of 2018, Andrea again was promoted, this time to a group that serviced clients with a higher net worth.

15.      In early 2019, UBS encouraged Andrea to take the Certified Financial Planner (CFP®) exam preparation course offered by Dalton Education, affiliated with Wake Forest University. Contingent upon passing the CFP exam, UBS promised to reimburse her out-of-pocket expenses, including the Dalton Education course.

16.      Andrea studied for the CFP exam on nights and weekends in 2019, including at the Charlotte WAC on the weekends.

17.      More recently, and shortly after her job was terminated by UBS, Andrea passed the CFP exam. Upon meeting the other requirements of the CFP Board, she is now a Certified Financial Planner.

18.      Following her promotions, Andrea's job responsibilities extended well beyond answering inbound calls: she was charged with placing outbound client sales calls, performing financial reviews with clients, making recommendations of securities products for each client's portfolio based on the client's financial goals, and placing securities trades for clients.

19.     The "key responsibilities" of an investment-center Financial Advisor, pursuant to UBS's own policies, include a section for "Autonomy." UBS claims, "Under supervision Employees complete tasks as required within their own objectives and in line with team goals. They work within clearly defined processes and may have sufficient leeway for their own input."

20.     At all relevant times, Financial Advisors had the autonomy to work with their own clients and to schedule their own outbound calls with clients.

21.     UBS rewarded Financial Advisors based primarily on sales performance. UBS did not consider the Financial Advisor's start time, or availability to accept inbound calls, as a factor in determining a Financial Advisor's bonus.

22.     Most of the sales made by Financial Advisors resulted from outbound calls, while inbound calls were more for service issues.

23.     The call system at the WACs allowed Financial Advisors, without management permission, to select from four or five "auxiliary states," each of which would take the Financial Advisor out of the queue for inbound calls. One of the auxiliary states included a state for use whenever a Financial Advisor was on an outbound call.

24.     Financial Advisors had the autonomy to schedule an outbound call, or some other auxiliary state, at the start time of their shift.

25.     WAC Financial Advisors were not required to be logged into the phone call system and ready to receive calls at the very beginning of their scheduled shift.

26.     The primary task of the 30 members of a separate "Client Foundations Group," as opposed to the Financial Advisors, was to answer incoming client calls and provide general account servicing.

27.    In March 2017, Dr. Peterson Giallaza—a board-certified neurologist and diplomate of the American Board of Psychiatry and Neurology—diagnosed Andrea with narcolepsy, a serious and debilitating sleep disorder marked by hypersomnolence, also known as hypersomnia.

28.    The hypersomnolence aspect of narcolepsy can cause afflicted persons to wake in the morning and drift uncontrollably back into a deep stage of rapid eye movement ("REM") sleep.

29.    Unmedicated, Andrea's narcolepsy results in her sleeping, on average, around 12 hours a night, sometimes more. Andrea struggles on a daily basis to fit into a "normal" world of 8 sleep-hours and 16-awake hours, as her brain has difficulty effectively regulating sleep.

30.    In order for Andrea to function in this real world, she was prescribed Adderall, a powerful combination of amphetamine and dextroamphetamine. Once Andrea was fully awake and took her medication, she functioned quite well and performed her work as a Financial Advisor without incident.

31.    Andrea battled her sleep disorder on a daily basis while working at UBS.

32.    Andrea's diagnosed narcolepsy occasionally caused her to wake up significantly after her alarm time. On these days, Andrea skipped portions of her typical morning routine to make it to the Charlotte WAC as soon as possible.

33.    As a direct result of Andrea's uncontrollable sleep disorder, she was occasionally and minimally late to work at UBS.

34.    Andrea's diagnosed narcolepsy resulted in the routine risk that she wake up in the morning and fall uncontrollably back into REM sleep.

35.     At all relevant times, Andrea has taken extraordinary steps to combat her narcolepsy, including by setting three alarm clocks and, on occasion, arranging for relatives to call her to ensure she was awake and getting ready for the day.

36.     While this system was successful on most work days, it was not without failures: her narcolepsy occasionally caused her to quickly and uncontrollably drift back into REM sleep after an alarm. On these occasions, Andrea's disability sometimes caused her to wake up too late to arrive to work on time.

37.     Andrea's occasional and minimal tardiness was consistent for the duration of her employment with UBS.

38.     In August 2019, the Federal Drug Administration approved a new drug called Wakix, which was first prescribed to Andrea on or about December 2019 (one month after UBS terminated her job). Wakix regulates H3 histamine levels in the brain and effectively treats narcolepsy. Andrea's hypersomnolence has been eliminated by Wakix.

### UBS's Shifting Goalposts on Essential Job Functions

39.     For two years starting in June 2017, Andrea's occasional tardiness to work went unaddressed by UBS's supervisors and human resources (HR).

40.     UBS never even mentioned to Andrea that the company had observed any tardiness before June 2019.

41.     During this period, UBS promoted Andrea, gave her an award, and paid her one or more bonuses for exceptional job performance.

42.     In June 2019, UBS's management style abruptly changed, and UBS began to micro-manage Financial Advisors at the Charlotte WAC. Start times became one of the "metrics" of the new micro-management style.

43. On June 18, 2019, Andrea was called into her managers' office, where managers James Newman and Andrew Harpp told Andrea that her tardiness was not compliant with the firm's Attendance and Punctuality Policy. UBS later called this policy "schedule adherence."

44. Upon information and belief, UBS's change in management style and novel interest in schedule adherence was occasioned by the implementation of some financial incentive for managers based on the metrics of the manager's employees, without regard to an employee's disability or request for accommodation.

45. Andrea responded to her managers on June 18, 2019 by disclosing that she was afflicted with narcolepsy, a sleep disorder that caused her occasional and minimal tardiness to work when she could not wake up in time some mornings.

46. One of Andrea's supervisor replied by telling Andrea he was "really disappointed" she had waited so long to disclose her disability. At the same time, the manager advised Andrea to contact HR, and she complied with the direction.

47. Andrea did not disclose her disability before June 2019 because her occasional and minimal tardiness simply was not an issue that was ever raised by UBS before that time.

48. UBS asked Andrea to have her neurologist complete a "Healthcare Provider Certification" (HPC) form. Section 1 ("Essential Job Functions") of this 1st HPC form, as completed by UBS, is reproduced below:

# Healthcare Provider Certification

## Section 1 – Essential Job Functions (to be completed by the Line Manager)

| Employee Information | |
|---|---|
| Name: Andrea Mckinley | GPN: 43508349 |
| Department: | Job Title: Financial Advisor |
| Regular Work Schedule: 10:00 – 6:30 | Job description attached: Y/N? NO |

The essential job functions for the role performed by this Employee include the following:

- Occasional overtime and weekend hours *Non-exempt role with Sales metrics.*     (Yes)/No
- Travel . If so,
  - within the region     Yes/(No)
  - across the U.S     Yes/(No)
  - internationally     Yes/(No)
- Working in multiple locations     Yes/(No)
- Standard use of computer (i.e.: chat, e-mail, Microsoft suite and data analysis)     (Yes)/No
- Mobility standard to an office environment (i.e.: standing, walking, sitting, bending)     (Yes)/No
- Other physical activity (i.e., moving/transporting computer equipment, connecting cabling under desks, etc.)     Yes/(No)
- Physical presence in office for direct daily supervision     (Yes)/No
- Physical presence in office to directly supervise others     Yes/(No)
- Interactions with others conducted in a professional manner     (Yes)/No
- In-person interactions with others conducted in a professional manner     (Yes)/No
- Other (specify) *peers & clients*

49.     The 1st HPC form supplied by UBS conspicuously <u>omitted</u> any reference to "schedule adherence," or any other similar term related to time or attendance, as an essential job function.

50.     UBS did not list "schedule adherence" in any of the pre-printed lists of "essential job functions," nor is "schedule adherence" listed in the "Other (specify)" category in the 1st HPC form.

51. On July 25, 2019, Dr. Giallaza completed the 1st HPC form. Dr. Giallaza concluded that Andrea's narcolepsy did not negatively affect her ability to perform her essential job functions, as listed on the 1st HPC form supplied by UBS.

52. Dr. Giallaza further indicated, "Due to the medical condition, patient may need accommodations to arrive late." Dr. Giallaza specified the accommodation, if any, was "intermittent leave / ability to arrive late" on approximately one occasion per week.

53. UBS responded by claiming, without explanation, that the company needed additional information. On this basis, UBS required Andrea to return to her neurologist and complete a 2nd HPC form.

54. This time the amended HPC form included "schedule adherence to regular work schedule of 10-6:30", not in the pre-printed list of essential job functions, but "penciled into" the "Other (specify)" blank at the bottom of the 2nd HPC form.

55. UBS never communicated to Andrea that "schedule adherence" was an essential job function on or before the completion of Section 1 of the 2nd HPC form.

56. Sometime after UBS completed the 1st HPC form, UBS fabricated a bogus "essential" job function of strict "schedule adherence" only for Andrea, and penciled it into Section 1 of the 2nd HPC form.

57. On August 2, 2019, Dr. Giallaza completed the 2nd HPC form in an almost identical manner to the 1st HPC form. He indicated Andrea may need an accommodation "to arrive late on days where her condition is worse," that is approximately once per week. Dr. Giallaza noted that Andrea's medication would manage "her ability to stay alert throughout the day upon arrival. Her issue may be just w/ arriving on time."

58.     On August 8, 2019, UBS first presented Andrea with an "accommodation": that she be required to strictly comply with "schedule adherence," but with an 11 am start time each day.

59.     This simply is not an accommodation: an 11 am start time was available to any Financial Advisor, with or without a disability.

60.     Andrea never asked for an "accommodation" that she start work at 11 am, with strict schedule adherence, and Andrea's neurologist never endorsed this accommodation as effective.

61.     UBS's first proposed accommodation did not account for, or otherwise take into consideration, the only accommodation endorsed by Dr. Giallaza on the 1st HPC and 2nd HPC, that is "intermittent leave / ability to arrive late" approximately one time per week.

62.     On August 20, 2019, Andrea asked UBS's HR representative that her request for reasonable accommodation be re-reviewed. She even offered to stay late on any shift when she was late, "which once again is usually only a few minutes," she reiterated.

63.     On August 26, 2019, UBS offered Andrea a different "accommodation": that she be allowed to be "minimally late" "approximately one time per week," *but only if* she gave her line manager at least one-hour advanced notice of her tardiness.

64.     This, again, is not an accommodation. UBS's employment policies do not require strict "schedule adherence," and they do not require one-hour advance notice of tardiness, in the first instance.

65.     The "Attendance and Punctuality" policy in UBS's employee handbook reads (bold added),

> We expect that you will come ready for work. If you are going to
> be tardy or absent, notify your line manager **as soon as possible.** If
> your manager isn't available, contact your next-level manager.

66.     UBS's punctuality policies for all employees *except* Andrea required they notify
their manager "as soon as possible" when they expected to be late. "As soon as possible" in this
context does not require notice at least one hour before the shift start time.

67.     By contrast, UBS's reverse "accommodation" for Andrea required that she notify
her manager at least one hour in advance of any late shift arrival.

68.     This "accommodation" was useless: if Andrea was awake one hour (or more)
before her shift, she would arrive at work on time, and possibly be early.

69.     Andrea's second line supervisor, Andrew Harpp, admitted the one-hour advanced
notice requirement made no sense.

70.     Neither "accommodation" offered by UBS was practical, effective, endorsed by
Andrea's neurologist, or requested by Andrea.

71.     UBS then suggested that Andrea return to her neurologist to have a 3rd HPC form
completed.

72.     A 3rd HPC form was completed by Dr. Giallanza on October 4, 2019, which yet
again, concluded that Andrea could perform her essential job functions with reasonable
accommodations. Dr. Giallanza noted that "at times [Andrea's] hypersomnia may interfere with
her abilities to arrive on time" and that a simple accommodation of "some flexibility of work
hours" would be sufficient to accommodate her disability.

73.     Dr. Giallanza wrote a letter that accompanied his response to this 3rd HPC
(bolding added):

> Ms. McKinley is followed in clinic for treatment of **narcolepsy.**
> There will be times when it may be difficult for her to get to work

> on time due to the condition. In addition it is not possible for her to
> give advance notification when these periods may happen due to
> her **hypersomnolence** and **difficulty at times waking up in the
> morning. Should you have additional questions, please feel free
> to contact my office.**

74.     In his letter, Dr. Giallaza offered an open invitation to UBS to educate them on
Andrea's narcolepsy, an often-misunderstood disability. Upon information and belief, Dr.
Giallaza's education of UBS would have included the promising new treatment for narcolepsy,
Wakix.

75.     On October 10, 2019, the HR department of UBS responded that the company
remained unmoved by Dr. Giallaza's response to the 3rd HPC—and that the existing
"accommodation" remained in effect.

76.     Andrea protested the one-hour notice requirement: "I cannot inform my manager
of anything if I am asleep and not conscious. As my doctor stated, I am being treated for a brain
disorder that has no cure. I am not sure what you expect me to do."

77.     UBS replied on October 15, 2019, again refusing to budge: "the existing approved
accommodation, which includes the one hour notice, remains in place."

78.     UBS effectively ended the interactive process with Andrea on or before October
15, 2019.

79.     The stress to Andrea of what had morphed from an interactive process into a
prolonged battle with UBS over her requested accommodation to a bogus essential job function
negatively impacted Andrea's narcolepsy and caused her emotional distress.

                    UBS Could Accommodate Andrea without any Burden

80.     UBS never accepted Andrea's reasonable request for accommodation—and
remained willingly ignorant about (a) the nature of her sleep disorder, (b) the effect of her

narcolepsy on her ability to awake some mornings, and (c) the impact of her disability on one or more major life functions.

81.     Accommodating Andrea's disability could be achieved with minimal burden to UBS.

82.     UBS falsely claimed that it could not accommodate Andrea's requested accommodation because it would burden the company's goal to answer all customer phone calls within 60 seconds.

83.     This goal was never communicated or even mentioned to Andrea during any time during her employment with UBS.

84.     Even if this goal existed, inbound calls could be routed to either the Charlotte WAC or the Weehawken WAC and answered by any one of the *more than 100* other Financial Advisors on duty to answer calls at 10:00 am each business day.

85.     UBS's shift start times are staggered and begin at 8:30 am, with the last shift starting at 11 am. The shifts overlap such that the total number of active Financial Advisors gradually increases from 8:30 am to 11:00 am and then gradually decreases in the evening from 5:00 pm to 7:30 pm.

86.     Because of the staggered shifts, the primary importance of the later morning shifts (i.e., 10:00 am and later) is to handle client calls in the evening, because the early morning shifts (8:30 am to 9:30 am) begin to end at 5:00 pm.

87.     The redundancy and geographic separation of the Charlotte WAC and the Weehawken WAC allows UBS to continue operations even if (a) one WAC must be shut down entirely, e.g., due to extreme weather conditions, or (b) if management schedules a meeting of Financial Advisors at one WAC.

88.     Andrea's occasional and minimal tardiness would create no noticeable burden to UBS's customer wait times, let alone an *undue* burden.

89.     UBS suffered no measurable or significant degrade to their client service by Andrea's occasional and minimal tardiness.

90.     Back in August 2019, at Andrea's request, UBS had provided her start- and stop-time data for the period from April 1, 2019 to August 9, 2019. This data was compiled into a spreadsheet. A true and correct accounting of Andrea's start- and stop-time data is found in the spreadsheet attached hereto as Exhibit 1.

91.     During this four-month period, Andrea started work, on average, 8 minutes *early* and ended work 11 minutes *late* (i.e., after the end of her scheduled shift).

92.     In a period of 78 work days, the data show 20 days of single-digit late starts, more than half of which were negligible (i.e., only 1 or 2 minutes late). The data further show only 4 days of double-digit late starts, the maximum being one 20-minute late start.

93.     These late starts were typical of the occasional and minimal tardiness that was attributable to Andrea's narcolepsy for the duration of her employment at UBS.

94.     For the third quarter of 2019, Andrea exceeded her goals in all three goal categories, including sales figures.

95.     Andrea's group at the Charlotte WAC included 15 to 20 other Financial Advisors. Upon information and belief, Andrea was the only Financial Advisor in her group at the Charlotte WAC who achieved this goal in all three goal categories.

96.     For this achievement, UBS paid a bonus of over $3,000 to Andrea on October 31, 2019.

97.     At all relevant times, UBS profited from the work performed by Andrea as a Financial Advisor.

98.     UBS's employee handbook reads, in pertinent part, "We're here for you. We want to help you thrive. To do this, we offer policies and programs to support you, both inside and outside of work."

UBS Instead Terminates Andrea's Employment

99.     On November 18, 2019, UBS terminated Andrea's employment, that is within three weeks of paying her a merit-based bonus for her exceptional performance in the third Quarter of 2019.

100.    UBS never formally disciplined Andrea for any performance issues, excluding punctuality, and Andrea excelled in her position as Financial Advisor at UBS.

101.    As a matter of company policy, UBS pays bonuses only to employees who can perform *at least* their essential job functions.

102.    UBS does not pay bonuses to employees who fail to perform their essential job functions.

103.    As a direct and proximate cause of UBS's unlawful termination of her employment, Andrea lost not only her sole source of income, but also the value of UBS's contributions to her 401k because UBS's contributions did not vest until three (3) years of employment.

104.    Andrea also suffered damages in the form of other fringe benefits that UBS promised to pay, including the cost of CFP-course expenses.

105.    To add insult to injury, on December 12, 2019, UBS filed a false and defamatory "Form U5" with FINRA, asserting that UBS terminated Andrea for cause.

106. Specifically, the Form U5 filed by UBS with FINRA asserts, "Employee was discharged for violation of firm policy for repeated late arrival to work, for failure to provide notice regarding her tardiness to her line manager."

107. UBS's "firm policy" for punctuality, as applied to Andrea, was unlawful. Consequently, the statement in her Form U5 regarding violations of firm policy was false, as all firm policies of UBS must comply with all applicable laws including, but not limited to, the Americans with Disabilities Act (ADA) and the Family Medical Leave Act (FMLA).

108. Statements in a Form U5 also must comply with all FINRA Rules, such as FINRA Rule 1122, which states (bolding added):

> No member or person associated with a member shall file with FINRA information with respect to membership or registration which is **incomplete or inaccurate so as to be misleading, or which could in any way tend to mislead**, or fail to correct such filing after notice thereof.

109. This false and defamatory Form U5 and, upon information and belief, other false and misleading statements made by UBS to prospective employers of Andrea unnecessarily lengthened the period Andrea was out of work.

110. Notwithstanding her diligent efforts, Andrea remained unemployed for 10 months after UBS terminated her as a Financial Advisor.

### FIRST CAUSE OF ACTION: FAILURE TO ACCOMMODATE (ADA) AMERICANS WITH DISABILITIES ACT: 42 U.S.C. § 12101 *et seq.*

111. All other paragraphs are incorporated herein by reference.

112. UBS at all relevant times has had more than 500 employees, and UBS is an "employer" as that term is used in 42 U.S.C. § 12111(5).

113. Andrea was UBS's "employee," as that term is used in 42 U.S.C. § 12111(4).

114. At all relevant times, Andrea had an impairment that substantially limited one or more major life activities, namely her sleep.

115. Andrea is a "disabled" individual, as that term is used in 42 U.S.C. § 12102(1).

116. Andrea was qualified to perform the essential functions of her job as a Financial Advisor at UBS, with reasonable accommodation, and to satisfy the skill, education, training, license, and other requirements for the job.

117. Andrea cooperated with UBS in identifying one or more reasonable work accommodations.

118. UBS responded by artificially raising the bar on Andrea's "essential" job functions, including by falsely claiming that strict adherence to UBS's attendance policy was an "essential" function of Andrea's job.

119. Reasonable accommodations under the ADA include modifying an employee's work schedule.

120. UBS unreasonably declined Andrea's requested accommodation.

121. UBS never offered Andrea intermittent leave under the Family Medical Leave Act (FMLA) as an accommodation for her disability.

122. UBS never claimed, and does not now claim, that Andrea was unable to perform any other essential job function, with or without reasonable accommodation, except for the attendance policy.

123. UBS failed to reasonably accommodate Andrea's work restrictions when the company could have done so without undue hardship, and Andrea has suffered damages as a direct and proximate result.

## SECOND CAUSE OF ACTION: DISCRIMINATION BASED ON DISABILITY (ADA)
### AMERICANS WITH DISABILITIES ACT: 42 U.S.C. § 12101 *et seq.*

124. All other paragraphs are incorporated herein by reference.

125. UBS unlawfully discriminated and retaliated against Andrea due to her disability by terminating her employment, and Andrea has suffered damages as a direct and proximate result.

126. UBS's refusal to provide or allow reasonable accommodations to Andrea's disability and its discharge of her because of her disability constitute discrimination in violation of the ADA.

127. UBS's refusal to meaningfully explore reasonable accommodations for her disability—and instead *doing the opposite*, by raising the bar for Andrea (and only Andrea) and then terminating her based on this artificially elevated stated—constitute gross, wanton, reckless, and/or intentional violations of her rights under the ADA, entitling her to punitive damages.

128. As a direct and proximate cause of UBS's unlawful discrimination, Andrea has suffered damages and is entitled to lost wages, fringe benefits, compensatory damages for humiliation and pain and suffering, and punitive damages for the wanton and intentional violation of her rights by UBS.

## THIRD CAUSE OF ACTION: INTERFERENCE WITH FMLA LEAVE
### FAMILY AND MEDICAL LEAVE ACT: 29 U.S.C. § 2615(a)(1)

129. All other paragraphs are incorporated herein by reference.

130. Andrea was an "eligible employee," as that term is referenced in 29 U.S.C. § 2611(2)(A). At all relevant times in 2019, Andrea was employed by UBS for at least 12 months, and she had been employed for at least 1,250 hours during each of the previous 12-month periods.

131.     UBS was Andrea's "employer," as that term is referenced in 29 U.S.C. §
2611(4)(A). At all relevant times, UBS employed more than 50 employees within a 75-mile
radius of its Charlotte WAC.

132.     Andrea had a "serious health condition," pursuant to 29 U.S.C. § 2611(11)(B) that
required continuing treatment by a healthcare provider.

133.     Andrea's diagnosed narcolepsy was a "chronic condition," pursuant to 29 CFR §
825.115(c).

134.     At all relevant times, her narcolepsy (a) required periodic visits for treatment by a
healthcare provider once every three (3) months, (b) continued over an extended period,
including through recurring episodes of the same underlying condition, and (c) caused an
episodic, rather than continuing, period of incapacity.

135.     Andrea's diagnosed narcolepsy is similar to other chronic conditions like asthma
and epilepsy.

136.     Andrea was entitled to take intermittent leave under the FMLA, specifically as
provided for under 29 U.S.C. § 2612(b)(1).

137.     UBS purports to have a "Flexible Work Arrangement (FWA)" policy for
employees to take intermittent leave under the Family Medical Leave Act (FMLA).

138.     UBS was required to notify Andrea of her eligibility to take FMLA leave within
five (5) business days of when UBS first "acquire[d] knowledge" that Andrea's intermittent
leave "may be for an FMLA-qualifying reason," pursuant to 29 CFR § 825.300(b).

139.     UBS first acquired knowledge that Andrea's intermittent leave was for an FMLA-
qualifying reason no later than her submittal of the 1st HPC form, on around July 25, 2019.

140.    At all relevant times, UBS failed to notify Andrea of her eligibility to take FMLA leave, in violation of 29 CFR § 825.300.

141.    Andrea provided UBS with sufficient certification(s) from her healthcare provider, on a form provided by UBS, that her chronic, serious medical condition required intermittent FMLA leave. Andrea was lawfully entitled to intermittent leave in one-half increments on days when her narcolepsy condition required the same, pursuant to 29 CFR § 825.205.

142.    Andrea could have met and did meet (a) the notice requirements as set forth in 29 CFR § 825.303 for unforeseeable FMLA leave, and (b) the "usual and customary notice requirements" of UBS. As set forth in UBS's handbook, the usual and customary notice requirements of UBS are to "notify your line manager as soon as possible."

143.    UBS retaliated against Andrea, and failed to take her right to FMLA-protected leave into consideration, in its decision to terminate her.

144.    UBS's termination of Andrea violated her rights under 29 USC § 2615(a)(1) by interfering with, restraining, and otherwise denying Andrea the right to exercise, or attempt to exercise, her right to intermittent FMLA leave.

145.    As a direct and proximate cause of UBS's interference with Andrea's right to FMLA leave, Andrea has suffered damages and is entitled to lost wages, fringe benefits, and other compensatory damages.

## FOURTH CAUSE OF ACTION: DISCRIMINATION BASED ON FMLA
### FAMILY AND MEDICAL LEAVE ACT: 29 U.S.C. § 2615(a)(2)

146.    All other paragraphs are incorporated herein by reference.

147.    UBS discharged Andrea from employment in a manner that discriminated against her for opposing practices made lawful under FMLA, in violation of 29 U.S.C. § 2615(a)(2).

148.    As a direct and proximate cause of UBS's unlawful discrimination under the

FMLA, Andrea has suffered damages and is entitled to lost wages, fringe benefits, and other

compensatory damages.

### FIFTH CAUSE OF ACTION: BLACKLISTING IN EMPLOYMENT
### N.C. GEN. STAT. § 14-355

149.    All other paragraphs are incorporated herein by reference.

150.    UBS's description of the basis for Andrea's termination on Form U5 was

unsolicited by any prospective employer, false and defamatory, and kept her from finding

another job in the financial industry for an extended period.

151.    Andrea suffered damages as a direct and proximate cause of the false and

defamatory Form U5 filed by UBS.

152.    UBS's false and defamatory statements on Form U5 constitute gross, wanton,

reckless, and/or intentional violations of Andrea's rights, such that an award of punitive damages

is warranted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Andrea McKinley ("Plaintiff") prays and demands judgment against Defendant UBS Financial Services, Inc. ("Defendant") as follows:

1.  declare that Plaintiff has suffered acts of discrimination at the hands of Defendant based on her disability and related FMLA leave;

2.  award Plaintiff compensation for loss of salary and other benefits, including all fringe benefits to which she would have been entitled had her employment with Defendant not been interrupted, in an amount exceeding $25,000, to be determined at trial;

3.  award Plaintiff compensatory damages for the humiliation, damage to her reputation, mental and emotional distress, and pain and suffering that she has experienced and endured as a result of the discriminatory actions of Defendant towards her, in an amount exceeding $25,000, to be determined at trial;

4.  award Plaintiff liquidated damages under the Third and Fourth Causes of Action, pursuant to 29 USC § 2617;

5.  award Plaintiff punitive damages;

6.  award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action, pursuant to 42 USC § 12205 and 29 USC § 2617;

7.  grant Plaintiff pre-judgment and post-judgment interest on all damages awarded, to the maximum extent allowed by law;

8.  grant Plaintiff a trial by jury on all issues so triable; and

9.  grant such other and further relief as to the Court seems just and proper.

This, the 23rd day of April, 2021.

Eric Spengler
N.C. State Bar No. 47165
SPENGLER AGANS BRADLEY, PLLC
352 N. Caswell Road
Charlotte, NC 28204
eric@spengleraganslaw.com
(704) 910-5469 (phone)
(704) 730-7861 (fax)

*Attorney for Plaintiff*

# Exhibit 1

# LOG-IN and LOG-OUT TIMES

| Week Number | Date | Log-in Time | Log-out Time | Shift (10 AM - 6:30 PM unless noted) | Early (+) Late(-) (minutes) | Overtime (minutes) |
|---|---|---|---|---|---|---|
| Week 1 | 4/1/2019 | 9:59 AM | 4:30 PM | | 1 | 0 |
| | 4/2/2019 | 9:59 AM | 6:44 PM | | 1 | 14 |
| | 4/3/2019 | 9:57 AM | 4:53 PM | | 3 | 2 |
| | 4/4/2019 | 9:59 AM | 6:30 PM | | 1 | 0 |
| | 4/5/2019 | 11:24 AM | 7:30 PM | | | |
| Week 2 | 4/8/2019 | 9:37 AM | 4:02 PM | | 23 | 32 |
| | 4/9/2019 | 9:59 AM | 6:30 PM | | 1 | 0 |
| | 4/10/2019 | 8:26 AM | 7:31 PM | | 94 | 1 |
| | 4/11/2019 | 11:34 AM | 6:34 PM | | | |
| | 4/12/2019 | 10:01 AM | 4:22 PM | | -1 | |
| Week 3 | 4/15/2019 | 10:00 AM | 10:28 AM | | 0 | |
| | 4/16/2019 | 10:15 AM | 6:46 PM | | -15 | |
| | 4/17/2019 | 9:55 AM | 6:30 PM | | 5 | 0 |
| | 4/18/2019 | 9:58 AM | 7:30 PM | | 2 | 0 |
| Week 4 | 4/22/2019 | 10:01 AM | 6:30 PM | | -1 | 0 |
| | 4/23/2019 | 8:03 PM | 4:08 PM | | | |
| | 4/24/2019 | 7:39 AM | 7:00 P.M | 8 AM - 5:30 PM | 2 | 0 |
| | 4/25/2019 | 10:02 AM | 6:45 PM | | -2 | 3 |
| | 4/26/2019 | | | 11 AM - 7:30 PM | 1 | |
| Week 5 | 4/29/2019 | 10:01AM | | | -1 | |
| | 4/30/2019 | | | | | 27 |
| | 5/1/2019 | | | 10:30 AM - 7:00PM | 5 | |
| Week 6 | 5/6/2019 | 11:01 AM | | 11 AM - 7:30 PM | -1 | |
| | 5/7/2019 | | | 11 AM - 7:30 PM | 156 | 0 |
| | 5/8/2019 | 5:30 PM | | 11 AM - 7:30 PM | | |
| | 5/9/2019 | | 11:15 AM | 11 AM - 7:30 PM | | |
| | 5/10/2019 | 11:04 AM | | 11 AM - 7:30 PM | -4 | |
| Week 7 | 5/13/2019 | 11:04 AM | | 11 AM - 7:30 PM | -4 | |
| | 5/14/2019 | 10:07 AM | | | -7 | |
| | 5/15/2019 | | | 8:30 AM - 5:00 PM | | |
| | 5/16/2019 | 10:07 AM | | | -7 | |
| | 5/17/2019 | | | | | |
| Week 8 | 5/20/2019 | | | | | |
| | 5/21/2019 | | | | | |
| | 5/22/2019 | 10:12 AM | | | -12 | |
| | 5/23/2019 | | | | 15 | |
| | 5/24/2019 | | | (Dismissed early; Friday before Memorial Day) | | 0 |

| Week Number | Date | Log-in Time | Log-out Time | Shift (10 AM - 6:30 PM unless noted) | Early (+) Late(-) (minutes) | Overtime (minutes) |
|---|---|---|---|---|---|---|
| *Week 9* | 5/28/2019 | (illegible) | (illegible) | | 0 | 11 |
| | 5/29/2019 | (illegible) | (illegible) | 10:30 AM - 7:00 PM | 11 | 44 |
| *Week 10* | 6/10/2019 | (illegible) | (illegible) | 9 AM - 5:30 PM | 15 | 60 |
| | 6/11/2019 | 10:04 AM | (illegible) | | -4 | 70 |
| | 6/12/2019 | (illegible) | (illegible) | | 65 | 0 |
| | 6/13/2019 | (illegible) | 5:02 PM | | (illegible) | |
| | 6/14/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| *Week 11* | 6/17/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| | 6/18/2019 | (illegible) | (illegible) | 10:30 AM - 7:00 PM | (illegible) | 1 |
| | 6/19/2019 | (illegible) | (illegible) | | (illegible) | 2 |
| | 6/20/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| | 6/21/2019 | 10:20 AM | (illegible) | | -20 | 0 |
| *Week 12* | 6/24/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| | 6/25/2019 | 10:02 AM | 3:40 PM | | -2 | |
| | 6/26/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| | 6/27/2019 | 10:06 AM | (illegible) | | -6 | 0 |
| | 6/28/2019 | 10:18 AM | (illegible) | | -18 | 0 |
| *Week 13* | 7/1/2019 | (illegible) | (illegible) | | (illegible) | 0 |
| | 7/2/2019 | 10:06 AM | (illegible) | | -6 | 0 |
| | 7/3/2019 | (illegible) | (illegible) | 8:30 AM Start (Dismissed early; day before July 4th) | (illegible) | |
| | 7/5/2019 | (illegible) | (illegible) | 9 AM Start (Dismissed early; day after July 4th) | | |
| *Week 14* | 7/8/2019 | (illegible) | (illegible) | | | |
| | 7/9/2019 | (illegible) | (illegible) | | | |
| | 7/11/2019 | (illegible) | (illegible) | | | |
| | 7/12/2019 | (illegible) | (illegible) | | | |
| *Week 15* | 7/15/2019 | (illegible) | (illegible) | | | |
| | 7/16/2019 | (illegible) | (illegible) | | | |
| | 7/17/2019 | 10:01 AM | (illegible) | | (illegible) | |
| | 7/18/2019 | (illegible) | (illegible) | | | |
| | 7/19/2019 | (illegible) | (illegible) | | | |
| *Week 16* | 7/25/2019 | 10:02 AM | 5:27 PM | | -2 | |
| | 7/26/2019 | 10:01 AM | (illegible) | | -1 | 4 |
| *Week 17* | 7/29/2019 | 10:05 AM | (illegible) | | -5 | 10 |
| | 7/30/2019 | 10:01 AM | (illegible) | | -1 | 1 |
| | 7/31/2019 | (illegible) | (illegible) | | | 2 |
| | 8/1/2019 | (illegible) | (illegible) | | | 23 |
| | 8/2/2019 | (illegible) | (illegible) | | | 3 |

| Week Number | Date | Log-in Time | Log-out Time | Shift (10 AM - 6:30 PM unless noted) | Early (+) Late(-) (minutes) | Overtime (minutes) |
|---|---|---|---|---|---|---|
| Week 18 | 8/6/2019 | 11:01 AM | 7:07 PM | 11 AM - 7:30 PM | -1 | |
| | 8/7/2019 | 10:59 AM | 8:11 PM | 11 AM - 7:30 PM | 1 | 41 |
| | 8/8/2019 | 11:05 AM | 9:40 PM | 11 AM - 7:30 PM | -5 | 130 |
| | 8/9/2019 | 11:00 AM | 7:30 PM | 11 AM - 7:30 PM | 0 | 0 |

# TOTALS

| NET START TIME | TOTAL OVERTIME |
|---|---|
| **649** (MINUTES) EARLY | **894** (MINUTES) |

# DAILY AVERAGES

| AVERAGE DAILY START TIME | AVERAGE DAILY OVERTIME |
|---|---|
| **8:19** (min:sec) EARLY | **11:28** (min:sec) |

| KEY | |
|---|---|
| | Arrived early or on-time; worked overtime or stopped work on-time. Early start-time is indicated as a positive (+) number in the "Early (+) / Late (-)" column. |
| | Authorized late arrival or early dismissal. Reasons for deviations from the shift time may include, for example, a doctor or dentist appointment, illness, or early dismissal on the day preceeding or the day after a holiday. |
| | Late arrival, which may have been caused by my disability, or unexpected traffic. Late start-time is indicated as a negative number in the "Early (+) / Late (-)" column. |

## NOTES

1) Raw log-in and log-out data provided by Respondent's management at the Charlotte Wealth Advice Center

2) Except for Week 6 and Week 18, standard shift times are 10 AM - 6:30 PM.

3) For Weeks 6 and 18, standard shift times are 11 AM to 7:30 PM

4) Deviations from standard shift times may occur for various reasons, such as management called staff meeetings, pre-holiday and post-holiday shift changes, and the swapping of shift times with other team members.

5) Net Start-Time is computed by adding up all early-start times (which are indicated as positive numbers), and subtracting all late-start times (which are indicated as negative numbers).



**SAB** SPENGLER AGANS BRADLEY PLLC

352 N. Caswell Road
Charlotte, NC 28204



CERTIFIED MAIL®

7020 3160 0000 5992 7216





1020
27608

U.S. POSTAGE PAID
FCM LG ENV
CHARLOTTE, NC
28204
APR 23, 21
AMOUNT

**$7.55**
R2303S100547-01

UBS Financial Services, Inc.
c/o Corporation Service Company- Registered Agent
2626 Glenwood Ave, Suite 550
Raleigh, NC 27608